Argued and submitted February 2, affirmed December 5, 2007

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## GREGG K. CLAPPER,
*Defendant-Appellant.*

### Multnomah County Circuit Court
### N70516; A129610

173 P3d 1235

D. Rahn Hostetter argued the cause and filed the brief for appellant.

Christina M. Hutchins, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Deits, Judge pro tempore.

WOLLHEIM, J.

**WOLLHEIM, J.**

After a trial to the court, defendant was fined $500 for the violation of possession of less than one ounce of marijuana under *former* ORS 475.992(4)(f) (2003), *renumbered as* ORS 475.864(3) (2005).[1] On appeal, he advances three assignments of error. We address two of defendant's assignments of error.[2] First, defendant argues that the trial court erred in denying his motion to suppress evidence seized pursuant to a search warrant. Second, defendant argues that the trial court erred in denying his motion to dismiss the charge for possession of less than one ounce of marijuana. We reject those contentions and affirm the conviction.

■ We review the sufficiency of a search warrant to determine whether, on the basis of the information in the affidavit, a neutral and detached magistrate could have concluded that there was probable cause to believe that the specified objects would be at the location sought to be searched. *State v. Forker*, 214 Or App 622, 624, 168 P3d 279 (2007).

In December 2004, Oregon State Troopers Duncan and Chandler executed a search warrant at a Portland residence on NE Marine Drive in Multnomah County. A Wallowa County magistrate had issued the search warrant on the previous day based on an affidavit prepared by Duncan, who had been investigating suspected illegal hunting activities at the Shilo Ranch in Wallowa County, including exceeding the hunting limit for elk[3] by defendant and the possible unlawful taking of a bear by another hunter, Brian. The warrant authorized any police officer of the State of Oregon to search for evidence of that unlawful elk taking, including a .338 Weatherby rifle, any wildlife parts, any illegal big-game parts, and any film, video, or hunting photos from the Shilo Ranch. The warrant directed the executing police officers to

---

[1] ORS 475.992 was renumbered in 2005, but the operative language remained unchanged from 2003. We refer to the 2003 statute throughout this opinion.

[2] Defendant also challenges the sufficiency of the evidence that he knowingly possessed marijuana. That assignment is not preserved and we will not consider it.

[3] The administrative rule in effect in 2004, OAR 635-065-0015(5), defined the hunting limit as one elk per person per hunting season. That limit was subject to exceptions that are not applicable to this case.

make an immediate search of "[a] private residence located [on] NE Marine Dr * * * in Portland, Oregon" and "[a] Jeep Cherokee registered to [defendant]." Neither the search warrant nor the incorporated affidavit explicitly identified the person or persons who lived at the Portland address.

During the search, the troopers discovered less than one ounce of marijuana. The troopers found the marijuana under a bed and in a dresser in the master bedroom. Duncan issued citations to defendant and to Kline, who also lived at the residence.

In his first assignment of error, defendant argues that the trial court erred in denying his motion to suppress evidence seized during the execution of the search warrant. Initially, defendant argues that the search warrant did not comply with ORS 133.545 and Article I, section 9, of the Oregon Constitution because the Wallowa County magistrate who issued the search warrant did not make explicit findings on the face of the warrant authorizing execution of the search warrant outside of Wallowa County. Next, defendant argues that the affidavit in support of the search warrant did not establish probable cause to believe that seizable items would be found in the location specified, because the affidavit failed to set forth particular facts that connected the residence either with defendant or with any unlawful activity. We address each argument in turn.

Defendant contends that "the search warrant was invalid because it failed to include any finding by the Wallowa County Court that one or more objects of the search in Multnomah County related to a crime committed or triable in Wallowa County as required by ORS 133.545(2)." According to defendant, in order to be valid, the Wallowa County magistrate was required to make express findings on the face of the search warrant authorizing the execution of the search outside of Wallowa County. The state, on the other hand, argues that ORS 133.545(2) does not require explicit findings by a magistrate.

In order to properly consider the parties' arguments, we must construe the text of ORS 133.545. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993) ("[T]he text of the statutory provision itself is the starting

point for interpretation and is the best evidence of the legislature's intent."). That statute provides, in part:

"(1)   A search warrant may be issued only by a judge. * * * Except as otherwise provided in subsection (2) of this section, a search warrant issued by a judge of a circuit court may only be executed within the judicial district in which the court is located. * * *

"(2)   Notwithstanding subsection (1) of this section, a circuit court judge may authorize execution of a search warrant outside of the judicial district in which the court is located, if the judge finds from the application that one or more of the objects of the search relate to an offense committed or triable within the judicial district in which the court is located."

Thus, ORS 133.545 provides that, in certain circumstances, a circuit court judge may authorize execution of a search warrant outside of that court's judicial district. Those circumstances require the authorizing judge to "find[ ] from the application" that at least one of the items sought in the search is related to a crime that was either committed or was triable within the judicial district in which the court is located, here, Wallowa County. ORS 133.545(2). We have only to look at the face of the search warrant and the incorporated affidavit to conclude that the warrant complied with ORS 133.545(2).

The face of the search warrant reads:

"IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF WALLOWA
IN THE NAME OF THE STATE OF OREGON

"* * * * *

"Upon information given under oath to me by an affidavit signed and sworn to be Trooper Brad Duncan, incorporated herein, *this court finds probable cause* to believe that the items described below are presently located in the area described.

"YOU ARE THEREFORE COMMANDED TO MAKE IMMEDIATE SEARCH OF:

"A private residence located [on] * * * NE Marine Drive * * * in Portland, Oregon. This residence is white in color.

The house numbers * * * are displayed on the front of the residence.

"A Jeep Cherokee registered to [defendant].

"TO SEARCH FOR:

A .338 Weatherby rifle.

Any wildlife parts, specifically but not limited to elk and bear meat.

Any illegal big[-]game parts.

Any film, video, computer files or digital cameras depicting hunting photos from the Shilo Ranch.

Any 2004 ODFW tags and licenses, validated or not."

(Emphasis added.) The search warrant incorporates Duncan's affidavit, in which he avers that defendant exceeded the bag limit on bull elk while hunting at Shilo Ranch and that it is common for hunters to keep evidence of their hunts in their homes and vehicles. Thus, the search warrant complied with ORS 133.545, as evidenced by not only what was on the face of the warrant itself, but also by Duncan's affidavit, which was incorporated therein.

■ Defendant also argues that the search warrant was void because it did not comply with Article I, section 9, of the Oregon Constitution.[4] Defendant, however, does not elaborate as to how the search warrant was deficient under the constitution. Because defendant cites the Oregon Constitution but does not make any specific arguments, we do not consider his assertion that the search warrant violated the constitution. *See State v. Thompson*, 328 Or 248, 254 n 3, 971 P2d 879, *cert den*, 527 US 1042 (1999) (refusing to address claim absent a "thorough and focused" analysis).

Next, we turn to defendant's probable cause argument. Defendant asserts that the probable cause threshold was not met because Duncan's affidavit (1) failed to make any connection between defendant and the residence to be

---

[4] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

searched and (2) failed to set forth particular facts establishing probable cause that any evidence of unlawful activity would be found at the residence. In essence, defendant argues that the facts in the affidavit were insufficient to establish a nexus between illegal hunting in Wallowa County—specifically, taking more than one elk—defendant, and the Portland residence.

The principles that govern our review of search warrants are well-settled. In order to lay the foundation for our analysis, we quote extensively from the Supreme Court's discussion in *State v. Henderson*, 341 Or 219, 224-25, 142 P3d 58 (2006):

> "ORS 133.545 and ORS 133.555 govern the issuance of search warrants. ORS 133.545 provides that an application for a search warrant shall be supported by one or more affidavits particularly setting forth the facts and circumstances tending to show that the objects of the search are in the places, or in the possession of the individuals, to be searched. ORS 133.545(4). A judge reviewing the application and supporting affidavit shall issue a search warrant if there is probable cause to believe that the search will discover things specified in the application * * *. ORS 133.555(2). In addition to the statutory requirements just described, Article I, section 9, of the Oregon Constitution provides that no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

> "* * * We analyze the affidavit in a common-sense manner, *State v. Moylett*, 313 Or 540, 552, 836 P2d 1329 (1992), and allow the magistrate to make reasonable inferences from the facts stated therein. *State v. Ingram*, 251 Or 324, 326, 445 P2d 503 (1968). While adhering to the probable cause requirement, we resolve doubtful or marginal cases in favor of the preference for warrants. *State v. Tacker*, 241 Or 597, 602, 407 P2d 851 (1965).

> "Probable cause for purposes of ORS 133.555(2) exists when the facts set out in the warrant lead a reasonable person to believe that seizable things will probably be found in the location to be searched. [*State v.*] *Goodman*, 328 Or [318], 325[, 975 P2d 458 (1999)] (quoting *State v. Anspach*,

298 Or 375, 381, 692 P2d 602 (1984)). That statutory definition also embodies the constitutional requirement of probable cause. *Anspach,* 298 Or at 380."

(Some citations omitted; internal quotation marks omitted; first ellipsis in original.)

Before we consider the sufficiency of the affidavit in this case, we pause to describe Duncan's affidavit. The affidavit begins with a recitation of Duncan's qualifications, training, and experience in law enforcement, with particular attention to his training and experience in the area of fish and wildlife. Next, it describes a contact that he made with a hunter in Wallowa County, whom he and another trooper observed with four spike elk heads in plain view in the bed of a truck. After making contact, Duncan verified hunting tags as well as the tags belonging to the occupants of a second vehicle traveling with that hunter.

The affidavit then states that, during the course of his investigation, Duncan learned that there may have been unlawful hunting taking place on the Shilo Ranch, Wallowa County, by the ranch's owners and guests, and that information was reinforced by Knapp, an Oregon State Trooper who had been a guest at the ranch while he was off-duty. In the affidavit, Duncan identified the sources of his information, including Knapp; Morris, the ranch manager; and defendant, who was interviewed by Duncan and another trooper at defendant's place of work in Portland. In other words, Duncan's information was based entirely on his knowledge as an experienced law enforcement officer and information gathered from named informants—Knapp, Morris, and defendant himself.

■■ Where an affidavit includes information from named individuals, we apply a "totality of the circumstances" test. *State v. Westfall,* 178 Or App 343, 349, 37 P3d 1030 (2001), *rev den,* 333 Or 595 (2002). "Under that standard, '[p]robable cause arises from information provided by named informants when a reasonable person, based on the totality of the circumstances, would believe that it is probable (more likely than not) that the objects of the search will be found at the location to be searched.'" *Westfall,* 178 Or App at 349 (quoting *State v. Pelster/Boyer,* 172 Or App 596, 601, 21 P3d 106

(2001)). When we evaluate whether an affidavit establishes probable cause, "we rely on the facts as stated, together with any reasonable inferences that can be drawn from those facts." *Westfall*, 178 Or App at 349.

■        Here, the sequence of facts and organizational structure of the affidavit support the reasonable inference that the location sought to be searched was defendant's residence. Defendant is first mentioned in the affidavit as a member of one group of hunters visiting the Shilo Ranch in 2004. The affidavit then states:

> "Mr. Morris [the ranch manager] stated that on the third day, October 29th 2004 he was with [defendant] when [defendant] killed a spike bull [defendant's first elk]. Mr. Morris stated that during their hunt on October 29th [defendant] told him (Morris) that he was with [the ranch owner] when a branch antlered bull was taken. Mr. Morris stated that [defendant] told him that after [the ranch owner] had shot and missed the branch bull several times, [defendant] was told to shoot it. Mr. Morris stated that [defendant] told him [that defendant] shot this branch antlered bull once and killed it [defendant's second elk].

> "Mr. Morris stated that he quartered all three of the bulls and loaded them into [defendant]'s jeep to be transported back to Portland. That Morris also cut one of the 5x6 point bull antlers from the skull plate and put them into [defendant]'s jeep with the meat. Mr. Morris stated that the spike head and remaining 5x6 point bull head were put into the burn pit at the ranch. * * *"

The affidavit then describes Duncan's interview with defendant at defendant's place of business in Portland:

> "[Defendant] told us that he had both a deer and elk tag for the 2004 hunting seasons. [Defendant] told us that he traveled to the Shilo Ranch * * *. [Defendant] further advised us that his elk hunting was done mostly with * * * Morris, the ranch manager. * * * That on the third day of the season, [defendant] killed a spike bull. [Defendant] further advised us that he had hauled the meat, which had been quartered, back to Portland with them. [Defendant] was asked if he had a transportation tag for the other meat he hauled and advised that he did not, that he was unaware that he had to have such a transportation slip with him to haul the game of other [hunters]. [Defendant] advised us

that he had not hauled back any of the elk heads or horns with him. [Defendant] was asked if he had taken one of the 5x6 bull antlers back to Portland and he stated no. [Defendant] later advised us that he had taken one set of bull antlers back with him, a 4x5 point bull rack, but not a 5x6 rack as he had been asked. [Defendant] also stated that he had left the antlers to his spike bull at the Shilo Ranch. [Defendant] was asked if he had shot one of the branch antlered bulls after [the ranch owner] had missed it several times. [Defendant] stated that did not happen. * * *"

Next, Duncan recounts his investigation into suspected unlawful hunting activities—including exceeding the bag limit of elk by defendant and the unlawful taking of a bear— and subsequent searches and seizures of evidence from the Shilo Ranch, from a meat processing business, and from the homes of other Shilo Ranch guests.

Thus, the affidavit begins with a broad description of what occurred and how Duncan came to discover those occurrences and narrows to a notable focus on defendant. Specifically, Duncan avers, "Based on my training and experience and evidence located[,] I know that [defendant] exceeded the bag limit for elk during the 2004 elk season." The affidavit continues, "I know that [defendant]'s tag went on one of the elk that was killed. * * * Morris also stated that [defendant] used his new .338 Weatherby rifle to kill the second elk. From my training and experience I know that hunters keep their rifles at their residence and/or in vehicles." Duncan avers that hunters keep photos and parts and pieces of their kill at their residences. The affidavit continues, "I know that any bear meat found at [defendant's home] would be from the illegal bear taken by Brian * * *." The paragraphs that immediately follow state:

"Based on the above facts and occurrences, your affiant has probable cause to believe that evidence of the crime exceeding the bag limit of bull elk can be located [on] * * * NE Marine Drive * * * Portland, Oregon 97230. The residence is a boathouse with white vinyl siding. To search for evidence of the crime of exceeding the bag limit of Bull Elk. This could include photos either video, digital, or still. This could also include the .338 Weatherby rifle used to kill the elk. This may include the elk tags used to validate the elk. Also, bear meat from Brian['s] bear may be at the residence.

"Therefore it is requested a search warrant be issued for the above listed properties. It is requested that the warrant allow the search of the residence, outbuildings, and [defendant]'s Jeep Cherokee Vehicle located in the parking lot."

Those last paragraphs are significant. In them, Duncan explicitly avers that evidence of a crime—unlawful hunting—is likely to be found at the specified Portland residence and that defendant was involved in unlawful hunting, specifically exceeding the bag limit for elk during the 2004 season. The affidavit thus explicitly connects defendant to unlawful hunting and implicitly connects defendant to the residence. What is more, Duncan avers that evidence of the illegal hunting—specifically, objects such as a .338 Weatherby rifle, any wildlife parts, including elk and bear meat, any illegal big-game parts, and any film, video, or hunting photos—may be located at the specified Portland residence. That list is helpful because some of those items are discussed only in connection with defendant—he hunted with a .338 Weatherby rifle—or the Portland residence—any bear meat found at the residence would be from Brian's illegally hunted bear. Finally, the last sentence of the affidavit requests authorization to search "the residence, outbuildings, and [defendant]'s Jeep Cherokee Vehicle located in the parking lot." Read together, it is reasonable to infer that the residence and the outbuildings sought to be searched are defendant's. An additional factor is that the only vehicle sought to be searched is defendant's Jeep.

Further reinforcing the factual nexus between the specified Portland residence, defendant, and evidence of unlawful hunting is Duncan's training and experience. *See Goodman*, 328 Or at 328 ("Facts derived from training and experience may contribute that necessary factual nexus in a determination of probable cause."). In *Goodman*, the Supreme Court concluded that the officer's training and experience was sufficient to establish probable cause that physical evidence of the marijuana growing operation, such as tools, fertilizer, and records, likely would be found at a secure indoor location such as the defendant's residence. *Id.* at 327-28. In *Goodman*, the court opined that, while a fact, absent any other information, could be understood to be innocent, that same fact, considered in the context of an officer's

experience and training, could establish probable cause sufficient for a search warrant. *Id.* at 329. Here, as in *Goodman,* Duncan's expertise is used to provide a criminal nexus between unlawful hunting in Wallowa County, defendant, and the Portland residence.

Reviewing the affidavit in a common-sense manner, *Moylett,* 313 Or at 552, and allowing the magistrate to make reasonable inferences from the facts stated therein, *Ingram,* 251 Or at 326, we conclude that the issuing magistrate could reasonably infer that defendant was involved in illegal hunting, that evidence of that illegal hunting could be found at the residence, and that defendant lived at the specified address on NE Marine Drive in Portland, Oregon. Thus, the trial court did not err in denying defendant's motion to suppress.

■ We next turn to defendant's second assignment of error. Defendant argues that the trial court erred in denying his motion to dismiss the violation because the charging instrument failed to state an offense as required by ORS 135.630(4). We disagree.

As noted, defendant was charged with possession of less than one ounce of marijuana. ORS 475.992(4)(f). That statute provides, in part:

> "[A]ny person who knowingly or intentionally is in unlawful possession of less than one avoirdupois ounce of the dried leaves, stems and flowers of the plant Cannabis family Moraceae [marijuana] is guilty of a violation, punishable by a fine of not less than $500 and not more than $1,000."

The charging instrument is a standardized Oregon Uniform Fish/Wildlife Citation and Complaint. A box titled "[n]o culpable mental state" was checked. Just above that checked box, the trooper listed the statute violated as "475.992," wrote in the description box, "UPCS ‹ 1 ounce marijuana," and listed the base fine as "[$]1,000."

The sufficiency of a complaint is governed by ORS 153.048, which provides:

> "(1)   The complaint in a violation citation must contain at least the following:

"(a) The name of the court, the name of the state or of the city or other public body in whose name the action is brought and the name of the defendant.

"(b) A statement or designation of the violation that can be readily understood by a person making a reasonable effort to do so and the date, time and place at which the violation is alleged to have been committed.

"(c) A certificate under ORS 153.045(5) signed by the enforcement officer."

The question before us is whether, under paragraph (b), the violation in the citation could have been "readily understood by a person making a reasonable effort to do so." In this case, we conclude that, irrespective of the box indicating "[n]o culpable mental state," a person making a reasonable effort could readily understand the offense charged, especially given that the citation listed that defendant was cited for violating ORS 475.992, described as "UPCS ‹ 1 ounce marijuana," with a base fine of "[$]1,000." Cf. *State v. Waggoner*, 228 Or 334, 337, 365 P2d 291 (1961) ("It is readily apparent that the legislature intended to make traffic complaints effective even though a person defending against one might have to make some reasonable inquiry * * * in order to know exactly what offense is charged."); *State v. Barnhardt*, 67 Or App 771, 773, 680 P2d 7 (1984) ("A [Uniform Game Citation and C]omplaint is sufficient, even though the defendant may have to make reasonable inquiries in order to know exactly what offense is charged.").

In sum, the trial court did not err in denying defendant's motion to suppress or in denying defendant's motion to dismiss.

Affirmed.